STATE OF NORTH CAROLINA v. ERNEST McNEIL

No. 4

(Filed 14 October 1970)

**1. Rape § 7— sufficiency of jury verdict**

    In this rape prosecution, there was no error in the jury verdict finding defendant "guilty as charged with a recommendation of life imprisonment" and judgment of life imprisonment pronounced thereon as certified by the clerk of superior court as a second addendum to the record.

State v. McNeil

2. Jury § 5— capital offense — method of jury selection — 12 veniremen placed in jury box for examination

In this rape prosecution, there was no error in the method of jury selection whereby 12 veniremen were placed in the jury box and examined by the State, the State made its challenges for cause and peremptory challenges prior to defendant's examination of any of the veniremen, the defendant then examined the 12 veniremen passed by the State and made challenges for cause and peremptory challenges, and the State was permitted to examine and challenge replacements for veniremen excused because of challenge by defendant before defendant was permitted to examine and challenge such veniremen, defendant having had full opportunity to confront, examine and challenge or pass each individual juror.

3. Rape § 5 — sufficiency of evidence for jury

In this rape prosecution, the State's evidence, including the victim's identification of defendant as her assailant and testimony by two witnesses that they saw defendant run from the crime scene, *held* sufficient for the jury.

4. Rape § 4— medical testimony of presence of male sperm — admissibility

In this rape prosecution, the trial court did not err in the admission of medical testimony that tests made disclosed the presence of male sperm in the victim's vagina within a short time after the assault, where a physician testified that he examined the victim, obtained the specimen, made the smear, placed the identifying mark on the slide, and placed the slide in the hospital records, and a pathologist testified that two days later he examined and evaluated the smear and that he found the presence of male sperm, the evidence tending to show penetration, one of the elements of rape.

5. Rape § 4— evidence that rape victim became pregnant

In this rape prosecution, the trial court did not err in allowing the prosecutrix to testify that as a result of the unlawful act of intercourse she became pregnant and gave birth to a baby, since such evidence tended to prove penetration, one of the essential elements of rape.

6. Criminal Law § 66— admissibility of in-court identification of defendant by rape victim — prior identification at school house

In this rape prosecution, the trial court properly concluded that the victim's in-court identification of defendant was not tainted or rendered inadmissible by reason of her having seen defendant in the presence of officers at a school house.

**7. Rape § 6— failure to submit lesser included offenses**

In this rape prosecution, the trial court did not err in failing to submit to the jury the lesser included offenses of assault with intent to commit rape and assault on a female by a male person, there being no evidence of such lesser included offenses.

APPEAL by defendant from *McKinnon, J.,* January 5, 1970 Regular Criminal Session, CUMBERLAND Superior Court.

In this criminal prosecution, the defendant, Ernest McNeil, was tried on a bill of indictment, proper in form, charging the capital felony of rape. When arraigned, the defendant pleaded not guilty. After the plea, the court entered the following order:

"The court directed that the selection of the jury be in accordance with the following written instructions:

*State of North Carolina vs. Ernest McNeill,* 69 CR 5423.

The Clerk shall read over the names of the entire jury panel in the presence and hearing of the defendant and his counsel.

The Clerk shall call from the panel twelve to have seats in the jury box. The State shall then conduct its *voir dire* examination of those twelve and shall make any and all challenges for cause against any of the 12, and then it may make its peremptory challenges. If the court shall allow a challenge for cause, or if the State shall excuse a juror peremptorily, the Clerk shall call a replacement into the box before the solicitor completes his examination or challenge of any other of the 12. When the State is satisfied with the 12 in the box, the Clerk shall then tender the 12 in the box to the defendant. The defendant shall then conduct his *voir dire* examination of those 12. The defendant shall then make any challenges for cause against any of the 12 and shall then make any peremptory challenges against any of the 12.

If by reason of cause of peremptorily a juror shall leave the box during the course of the defense counsel's examination of the jurors, the clerk shall not immediately recall a replacement to the box, but shall wait until the defendant shall state to the court that he is satisfied with those of

State v. McNeil

the 12 which remain after they have once been tendered him by the State.

If there have been no members of the 12 removed, the clerk shall proceed to empanel the jury. If anyone for cause or peremptorily shall have been removed by the defendant, then after remaining ones have been stated by the defendant to be satisfactory with him, he shall have replacements called for the vacant seats by the clerk from the panel at large.

Then the State must by virtue of G.S. 9-21(b) be allowed first to examine any and all replacement jurors in the box and make challenges both for cause and peremptorily before the defendant shall be allowed to question any replacement. At all times the State is the party to be first satisfied with any given juror before he shall be ever tendered to the defendant. Those jurors which shall have been tendered to a defendant by the State and not challenged for cause or peremptorily by the defendant, may not thereafter be challenged by the defendant. The defendant may not stand any at the foot of the list or make any reservation of any challenge to await and see whom the replacement shall be. Once the defendant has passed, he has passed for all purposes.

The jury as finally passed shall be empaneled according to the traditional procedure.

The defendant objected to this procedure, the objection was overruled by the court, and the defendant excepted. This constitutes defendant's EXCEPTION No. 1."

After the selection of the jury in accordance with the court's directive, the defendant excepted to the manner of selection. He did not interpose any objection to any individual juror who was selected. He did not exhaust his peremptory challenges. After the jury was empaneled, the State introduced evidence as herein summarized or quoted.

On February 26, 1969, the victim of the alleged assault, Theresa Miles, was 15 years of age. She was a student at Washington Drive Junior High School in the City of Fayetteville. On the morning of each school day, she rode to the school in a

State v. McNeil

relative's automobile. However, she walked home at the end of the school day.

After school on February 26, 1969, Theresa Miles and two school companions started to their respective homes on foot. Their paths home pass to the rear of Fayetteville College, through a park, along the railroad track, either side of which was covered with trees, bushes and undergrowth. The area was described in the evidence as a park. Theresa and her two companions, who lived near each other, separated in the park. Theresa continued on alone towards home. At a point near a clay pit in the park, a young man whom she did not know passed her, then turned and grabbed her from behind, pulled her into the bushes, struck her in the face with his fist, threatened her with an open knife, and raped her.

It so happened that two young boys, Lynwood Thomas, aged 13 and Elijah Morrison, aged 11, came to the park with a shovel and bucket to gather dirt from the clay pit. They heard a girl's voice cry "stop." They heard a commotion and saw movement in the bushes. Morrison threw a stick in the direction of the movement. Immediately the defendant arose from the ground and fled. The boys were well acquainted with Ernest McNeil and identified him as the man they saw run from the scene.

Theresa immediately emerged from the same place, crying, part of her clothes were off, she was barefooted, and had mud and pine needles in her hair and on her clothing. She told them she had been raped and asked them to go home with her. This they refused to do. When she got home, she reported what had happened. The officers were notified and the victim was taken to the hospital. The alarm went out and the search began. Soon thereafter, the officers interviewed Lynwood Thomas and Elijah Morrison. Both told the officers that Ernest McNeil ran away from the scene.

At the hospital, Theresa was examined by Dr. Hugh Equez, who testified that she had bruises on her hip, about her head, scratches on her legs; that she was agitated and upset. He made a vaginal examination which disclosed fresh lacerations and fresh blood. The doctor expressed the opinion that prior to the recent injury, Theresa had not had intercourse. He made a smear, swabbed from the victim's vagina, marked the slide, and placed it in the hospital files for examination by a Pathologist. Dr.

Steffe, admitted to be an expert, examined the slide on February 28, 1969 and testified he found the presence of male sperm. The defendant's objection to the testimony was overruled.

After talking with Lynwood Thomas and Elijah Morrison on the day of the assault, the officers began searching for Ernest McNeil. At the time of their first call, he was not at home. They left a message that they wanted to see him at police headquarters. He did not report. On the following morning, they found him at home. At the time, he was a prime suspect though the officers refrained from arresting him until Theresa had an opportunity to see him. He willingly went with them to the school. When Theresa saw him through a window, she said, "That is him." Thereafter, they took him to police headquarters, obtained and served a warrant charging him with rape.

Lynwood Thomas and Elijah Morrison saw the defendant leave the scene and testified that Theresa was crying and asked them to go home with her. The officers went to the clay pit in the park where they found Theresa's shoes, her pocketbook and two school books.

Theresa testified that as a result of the unlawful act of intercourse, she became pregnant and gave birth to a baby, which at the time of the trial was two months old. In the opinion of the doctor, the child was born within the normal period of gestation after the date of the assault. The evidence as to the birth of the child was admitted over defendant's objection.

The defendant's counsel announced that the defendant would object to Theresa Miles' evidence tending to identify the defendant as her assailant. The attorneys agreed, however, that the admissibility of her evidence would be determined after the State had completed its case. When the State's evidence was concluded, the court conducted a *voir dire* in the absence of the jury. The court took into account the evidence already introduced and the additional evidence of the defendant who testified that the officers never advised him that he had the right to counsel at the time they took him to the school for the confrontation. The court made findings of fact, and adjudged that Theresa's in-court identification of the defendant was admissible.

At the conclusion of the findings, the defendant made a motion to exclude all of the testimony of identification given by Theresa Miles. The court offered to instruct the jury not to consider the testimony of Theresa Miles concerning the identifica-

tion at the school. The defendant objected unless the court excluded her in-court identification. Defense counsel stated, "I am asking that you not give them that instruction (to disregard the identification at the school). My motion was to strike all in-court identification. I feel that it would be prejudicial to strike a portion and to leave the rest in."

At the conclusion of the State's evidence, the defendant elected not to offer testimony. The judge charged the jury to return one of three verdicts: (1) guilty of rape; (2) guilty of rape with a recommendation that the punishment be imprisonment for life in the State's prison; (3) not guilty. The jury returned a verdict which the court has finally certified as follows:

"FOREMAN: We find the defendant guilty as charged, with the recommendation of life imprisonment."

The jury was polled at the request of the defendant's counsel and each juror answered that he found the defendant Ernest McNeil guilty of rape with a recommendation of imprisonment for life in the State's prison. From the judgment of life imprisonment, the defendant appealed.

*Robert Morgan, Attorney General, Sidney S. Eagles, Jr., Assistant Attorney General for the State.*

*Downing, Downing and David by Ray C. Vallery for the defendant.*

HIGGINS, Justice.

At first this Court had difficulty in ascertaining the precise verdict rendered by the jury in this case. The original record filed here cites: "The jury return as its verdict that the defendant, Ernest McNeil, is guilty of the charge." The record further recites: "The jury returned a verdict of guilty with a recommendation of life imprisonment." Subsequent to the filing of the original record, but before the oral argument, an addendum to the record was filed. The addendum contained the following: "The jury, for its verdict, returned into open court and announced that they had found the defendant guilty of rape with a recommendation of mercy. Upon the coming in of the verdict of guilty of rape, counsel for the defendant moved that the jury be polled. Whereupon the jury was duly polled, each juror entered for his verdict that he found the defendant guilty of rape." Both the original record and the first addendum were

certified by the clerk as correct. It appears the original record of the case on appeal was served on the solicitor by defense counsel. There being no exception or counter-case, the clerk certified the record which defense counsel had prepared and filed.

[1] In view of the gravity of the case, this Court requested the clerk of Cumberland Superior Court to certify a correct record, according to the minutes, approved by the presiding judge. That record, as certified in a second addendum, discloses the following verdict returned by the jury: "We find the defendant guilty as charged with a recommendation of life imprisonment." The jury was polled and the record shows each juror assented to the verdict. We discover no error in the verdict and judgment thereon as certified in the second addendum.

[2] The defendant's exception to the selection of the trial jury in the manner required by the court's directive is not sustained. The defendant had full opportunity to confront, to examine and to challenge or pass each individual juror. The record does not disclose any objections by the defendant to any member of the trial jury or that he had exhausted his peremptory challenges. This Court, in *State v. Perry* filed this day, has passed on a similar objection to the method of jury selection. The authorities supporting the method of selection are cited in the Perry case.

[3] The defendant's challenge to the sufficiency of the evidence to go to the jury and to support the verdict are utterly without merit. The victim's testimony at the trial made out a strong case. She was making outcry at the time the two boys arrived at the clay pit where the offense occurred. When Elijah Morrison heard the outcry and saw movement in the bushes, he threw a stick in the direction of the movement. The defendant immediately raised up from the ground and ran. Theresa Miles, the victim, came out crying, with mud and pine needles on her clothing and in her hair, and without her shoes. She told how her assailant had grabbed her and dragged her through the clay pit and into the bushes, where she struggled and lost her shoes. Her story and her identification were corroborated by many circumstances and contradicted by none. The officers found the place in the bushes where the weeds and pine needles were mashed down.

This case is unusual in that two boys, Lynwood Thomas and Elijah Morrison, happened to appear upon the scene during the assault. They knew Ernest McNeil. Both identified him as the man who ran from the scene. They reported to the officers what

they had observed. The identity of the defendant was well established by the information in the hands of the officers.

[4, 5]  The defendant contends the court committed error in overruling his objection and permitting Drs. Equez and Steffe to testify that the tests made disclosed the presence of male sperm in the victim's vagina within a short time after the assault. Dr. Equez made the examination, obtained the specimen, made the smear, placed the identifying mark on the slide, and then placed the slide in the hospital records. Two days later, Dr. Steffe, a Pathologist, examined and evaluated the smear, and testified as to what the examination disclosed. The evidence tended to show penetration, one of the elements of rape. To like effect was the evidence of pregnancy which was admitted over defendant's objection. The defendant's plea of not guilty placed upon the State the burden of proving beyond a reasonable doubt all essential elements of the offense charged. Evidence tending to prove any essential element of that offense was properly admitted. *State v. Perry*, 275 N.C. 565, 169 S.E. 2d 839; 62 A.L.R. 2d 1080, and cases cited.

[6]  The defendant denies the admissibility of the victim's evidence identifying him as her assailant. Specifically, he contends his constitutional right to a lawyer was violated by the officers in that they took him to the school house where one officer stood by him on the steps near the school and another officer took Theresa to a window, where she observed him and said, "That is him." Admittedly he was not represented by counsel and had not waived his right to counsel at that time. He was a suspect, but not under arrest. He consented to accompany the officers. He contends further that his in-court identification by Theresa was tainted by the prior identification at the school house and the in-court identification should have been excluded.

In passing on the admissibility of the victim's evidence of identification, defense counsel and the solicitor seem to have agreed that the victim should be permitted to give her identifying evidence before the jury. Then after the State had closed its evidence, the court, in the absence of the jury, should conduct a further hearing on the admissibility of the identification and determine whether the evidence should remain in or be excluded. (The court does not recommend this procedure because evidence later ruled incompetent had been heard by the jury.) However, the defendant does not contend he was prejudiced by the agreement and the procedure followed.

At the conclusion of the *voir dire* in the absence of the jury, the court expressed doubt as to the admissibility of Theresa's identification at the school house (which the jury had already heard) on the ground the defendant was not represented by counsel and had not waived his right to counsel. However, the court offered to withdraw from the jury the evidence that she identified him at the school house. The defendant permitted the evidence to be introduced but moved that all of Theresa's evidence of identification be withdrawn from the jury. Defense counsel objected to the withdrawal of the identification made at the school house unless the court would also withdraw the in-court identification. This the court declined to do. At the conclusion of the *voir dire,* the court found the facts and properly concluded the in-court identification was not tainted or rendered inadmissible by the procedure at the school house.

[6] We hold the trial court did not commit error in admitting the in-court identification. The officers took the defendant to the school for Theresa to see him before he was arrested and before a warrant was issued. At the time, the officers had Theresa's description of her assailant, though she had never seen him before and did not know his name. They also had the statements of Lynwood Thomas and Elijah Morrison that they knew the defendant and that when they came to the clay pit in the park they heard a feminine voice crying out "stop" and saw movement in the bushes. Elijah threw a stick in the direction of the movement, whereupon the defendant came out running and Theresa came out crying. Pine needles were in her hair, mud was on her clothing, and she had lost her shoes.

On the day following the assault, the officers took the defendant to the school house for Theresa to see him. At that time, it would seem the officers had abundant evidence to make out a case of rape against the defendant. However, to guard against charging one whom the victim might exonerate, they requested Theresa to look at the defendant before the warrant was sworn out. The confrontation at the school was to guard against a case of mistaken identity by the two boys, Lynwood Thomas and Elijah Morrison. Theresa's identification was in corroboration of the evidence the officers already had from the two boys. Her identification was not necessary to warrant holding the defendant, but if she failed to identify him, the failure could be beneficial to him. Theresa's identification at the school house was only a part of the identifying evidence. She did not know the

defendant. She had not seen him before. However, the two boys lived near him. They knew him well, and positively identified him. The identifying evidence, in its totality, more than met the test laid down in *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967. All the evidence of identification (none of which is contradicted) does not even suggest a case of mistaken identity.

General suspicion of identification by the victim if the suspect is in the custody of officers, or if he is in jail, or even if his picture is taken from a rogue's gallery is not altogether warranted. Officers are under oath to discharge their duties honestly and according to law. It is their duty to discover and to apprehend the guilty. It is equally their duty to shield the innocent. The seizure of a suspect without probable cause and merely for the sake of having someone in custody is out of bounds and will react to the discredit of the officers. There is both credit and satisfaction, however, in getting "the right man." The opposite is true if they bring in the wrong one. In the absence of evidence to the contrary, may the appellate courts not assume the officers acted with reasonable caution and with good intentions? Likewise, may they not assume the victim of an atrocious crime is interested in the apprehension and punishment of the "right man"? If the victim once identifies the wrong man, the later identification of the right man will be tarnished. Why should the appellate courts indulge the presumption that the victim's in-court identification is not reliable and should be excluded in cases where the witness had made a prior identification, even if the suspect was in custody? What difference does it make if the identification was made while he was in custody, in a line up, or in a rogue's gallery picture?

In this case the confrontation at the school was for the purpose of confirming the identification made by the two boys. *Stovall v. Denno, supra.* The main issue is the guilt or innocence of the suspect. To exclude the evidence of the victim identifying him because she had previously seen him in the presence of officers is a case of the tail wagging the dog.

The trial court, out of an abundance of caution, offered to strike the evidence that Theresa saw and identified the defendant at the school house. Although the court offered to strike this evidence, however, in deference to defense counsel's request, the court left it in the case. The defendant requested the court not to strike the evidence of identification at the school house

unless the in-court identification was also stricken. The court properly denied the motion to exclude the in-court identification. *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345; *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581.

[7]  As a final objection to the trial, the defendant contends he should be permitted to have another go at the jury because the trial judge failed to submit the lesser included offenses: assault with intent to commit rape, and assault on a female by a male person. The uncontradicted evidence made out a case of rape. The court charged the jury to return a verdict: (1) guilty of rape; (2) guilty of rape with a recommendation that punishment be imprisonment for life in the State's prison; or (3) not guilty. Failure to find the defendant guilty of (1) or (2) required a verdict of not guilty. The defendant was not prejudiced by the charge which required the jury to acquit of all included lesser offenses. There was no evidence of the lesser included offenses, and the court was correct in refusing to permit the jury to consider them. 6 Strong's N. C. Index 2d, Rape, Sec. 6, p. 578; *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481; *State v. Jones,* 249 N.C. 134, 105 S.E. 2d 513; *State v. Brown,* 227 N.C. 383, 42 S.E. 2d 402.

After careful review of the trial and all objections thereto presented by exceptions and assignments of error, we find

No error.